**Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000666
31-MAY-2013
10:47 AM**

CAAP-11-0000666

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
KAOLINO RICHARD BAKER, Defendant-Appellant.


APPEAL FROM THE FAMILY COURT OF THE THIRD CIRCUIT
KONA DIVISION
(FC-CR. NO. 10-1-0329K)


MEMORANDUM OPINION
(By: Nakamura, C.J., and Fujise and Leonard, JJ.)


Plaintiff-Appellee State of Hawai'i (State) charged Defendant-Appellant Kaolino Richard Baker (Baker) with abuse of a family or household member, in violation of Hawaii Revised Statutes (HRS) § 709-906(1) (Supp. 2012).[1] The complaining witness (CW) was Baker's girlfriend. Baker and his counsel signed a "Waiver of Jury Trial." After a bench trial, the Family Court of the Third Circuit (Family Court) found Baker guilty as charged and sentenced him to two years of probation. Baker's

---

[1] HRS § 709-906(1) provides, in relevant part:

    It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member. . . .

    For the purposes of this section, "family or household member" means spouses or reciprocal beneficiaries, former spouses or reciprocal beneficiaries, persons who have a child in common, parents, children, persons related by consanguinity, and persons jointly residing or formerly residing in the same dwelling unit.

term of probation was subject to the special condition that he serve thirty days of imprisonment, with twenty-five days suspended as long as he remained compliant with certain other conditions of his probation. Baker's sentence was stayed pending appeal.

Baker appeals from the Judgment of the Family Court that was entered on August 10, 2011. On appeal, Baker argues that: (1) the Family Court plainly erred in failing to ensure that Baker fully waived his right to a jury trial; (2) the Family Court erred in finding Baker guilty because there was insufficient evidence to negate a "choice of evils" justification defense; and (3) the Family Court violated Baker's rights by relying on a written police report of Baker's interview statement, which had not been admitted at trial, to find Baker guilty and in relying on that report, which Baker claims he did not have the opportunity to review, controvert, or supplement, in sentencing him.[2] For the reasons explained below, we affirm the Family Court's Judgment.

BACKGROUND

Baker's prosecution stemmed from an altercation with the CW, who at the time was his girlfriend. Baker and the CW lived together for six years and owned a house together. At the time of trial, they no longer lived together, but still jointly owned the house.

On the night in question, the CW and her friend Tara had left a bar at about 2:00 a.m., after the last call. The CW had agreed to give Tara a ride to her car. Baker, who had also been at the bar, arrived at the CW's car after the CW and Tara had entered it. All three of them were intoxicated. Baker reached into the car and attempted to grab the keys from the CW. A struggle ensued and Baker ended up with the keys.

_____

[2] The Honorable Joseph P. Florendo, Jr., presided over Baker's trial. The Honorable Andrew P. Wilson presided over the proceedings relevant to Baker's waiver of his right to a jury trial.

I.

Officer Jared Cabatu (Officer Cabatu) of the Hawai'i County Police Department was on duty "staging" with several officers in an area near to the CW's parked car. Officer Cabatu testified that he heard a female yell for help and say that "her friend was getting hit by her boyfriend." As Officer Cabatu responded to the call for help, he saw Baker look towards the police officers and then quickly walk away from the scene.

According to Officer Cabatu, the CW was crying and appeared intoxicated. The CW told Officer Cabatu that she had been hit twice, once in the face and once in the arm. Officer Cabatu saw a red mark on the CW's face and took photographs of her face and arm. Officer Cabatu had the CW fill out a "Domestic Violence Statement Form," which the CW filled out and signed. The CW wrote: "My boyfriend tried to get my keys in my car and hit me in my face and grabbed my keys." According to the answers to questions set forth in the form, Baker had hurt the CW with his "fist," and the CW felt pain which was described as "mild." The CW signed the form under the statement, "I AFFIRM THAT THE INFORMATION IN THIS DOCUMENT IS TRUE AND CORRECT."

The police subsequently located Baker, and Officer Cabatu placed Baker under arrest. Baker waived his <u>Miranda</u> rights, signed a waiver of rights form, and made a statement regarding the incident to Officer Cabatu. Prior to the prosecutor questioning Officer Cabatu about Baker's interview statement, Baker's counsel requested that he be allowed to voir dire Officer Cabatu on the voluntariness of Baker's statement, and the Family Court granted the request. After defense counsel's voir dire, the State introduced Baker's waiver of rights form. Officer Cabatu testified that Baker stated that: (1) Baker and the CW, his girlfriend, got into a verbal argument because the CW saw Baker talking to another woman at the bar; (2) Baker was trying to get the keys away from the CW while she was driving; and (3) Baker "denied any physical contact with anybody in the car."

3

During Officer Cabatu's direct examination, the prosecutor used Officer Cabatu's police report of Baker's interview statement to refresh the officer's recollection about Baker's statement:

> Q.    Would looking at your report regarding the interview refresh your recollection as to [Baker's] statement?
>
> A.    Yes, sir.
>
> [Prosecutor]:  I'm showing one page from the officer's report to defense counsel at this time.
>
> May I approach?
>
> THE COURT:  All right.
>
> [Prosecutor]:  Q.    And when your memory is refreshed, please look up.
>
> Officer, is your memory refreshed?
>
> [Officer Cabatu]:  A.    Yes, sir.

The prosecutor also used the "OBTS" portion of the police report to refresh Officer Cabatu's recollection as to the time of Baker's arrest.

## II.

The bench trial began on June 8, 2011, with Officer Cabatu's testimony.  The State had subpoenaed the CW to appear on that date, but the CW failed to appear and left a voice mail that she was sick.  The Family Court continued the trial, which resumed on August 10, 2011.

When the trial resumed, the CW appeared and was called as a witness by the State.  The CW denied that Baker had hit her. When confronted with her Domestic Violence Statement Form, the CW acknowledged that the statement "My boyfriend tried to get my keys in my car and hit me in my face and grabbed my keys" was in her handwriting and that she had signed the form.  However, the CW claimed that she did not remember filling out the form and that other portions of the form were not in her handwriting.  The State offered the CW's Domestic Violence Statement Form as substantive evidence in light of the CW's recantation, and the

4

Family Court admitted it in evidence. On cross-examination, the CW testified that Baker did not hit her intentionally and that she did not feel any pain during the incident.

### III.

After the State presented its case-in-chief, Baker moved for judgment of acquittal based on the State's failure to introduce sufficient evidence that the CW suffered pain, which Baker argued was required to establish the charged offense. The Family Court denied the motion.

Baker testified in his own defense. According to Baker, he and the CW were at a bar, and the CW was "really intoxicated and stumbling." When the CW left the bar and got into her car, Baker became concerned because he did not want the CW to get into an accident. He reached into the car to pull the keys from the ignition and a struggle ensued, with the CW biting Baker's arm. Baker stated that he did not hit the CW but he "did elbow her." The CW's friend, Tara, started screaming, and Baker left because he did not "want to deal with her screaming like that."

On cross-examination, Baker acknowledged that he was intoxicated on the night in question. When cross-examined about his statement to the police, Baker asserted that he had not had an opportunity to read the police reports regarding his statement and had not reviewed the statement with his attorney. Baker indicated that he may have hit the CW accidentally.[3/]

The defense also called Chad, a long-time friend of Baker, who said he witnessed the incident. Chad saw Baker go up to the CW's car, argue with the CW, then close the door. Chad testified that he did not see Baker hit or strike the CW in any way. After Baker closed the door to the CW's car, Baker walked over to Chad and asked Chad to pick him up at a different location. Chad's car was parked in the same parking lot as the

---

[3/] The questions posed to Baker were whether he had hit Tara accidentally, but it appears that Baker was referring to the CW in his answers.

CW's car, and Chad did not know why Baker asked to be picked up at a different location.

### IV.

After closing arguments, the Family Court found that the State had proven beyond a reasonable doubt that Baker had committed the offense of abuse of a family or household member. The Family Court stated that it was relying on the testimony of Officer Cabatu and the CW's Domestic Violence Statement Form in reaching its decision. The Family Court then proceeded with Baker's sentencing.

### DISCUSSION

### I.

Baker contends that the Family Court plainly erred in failing to ensure that Baker "fully" waived his right to a jury trial. "[W]e review the validity of a defendant's waiver of his/her right to a jury trial under the totality of the circumstances surrounding the case, taking into account the defendant's background, experience, and conduct." State v. Friedman, 93 Hawaiʻi 63, 70, 996 P.2d 268, 275 (2000). "Where it appears from the record that a defendant has voluntarily waived a constitutional right to a jury trial, the defendant carries the burden of demonstrating by a preponderance of the evidence that his/her waiver was involuntary." Id. at 69, 996 P.2d at 274.

We conclude, under the totality of the circumstances, that Baker validly waived his right to a jury trial. On February 23, 2011, the Family Court held a hearing during which Baker's counsel represented that Baker had "executed a 'Waiver of Jury Trial' form." The Family Court questioned Baker about the form as follows:

> THE COURT: You're Kaolino Baker?
>
> MR. BAKER: Yes.
>
> THE COURT: I'm looking at a document, and showing it to you, entitled "Waiver of Jury Trial." It's two pages. Is that your signature on the back?
>
> MR. BAKER: Yes.
>
> THE COURT: And you signed this on February 23, 2011?

MR. BAKER: Yes.

THE COURT: Do you have any questions about this document?

MR. BAKER: No.

THE COURT: In the last 24 hours have you had any alcohol or any drugs or medicine?

MR. BAKER: No.

THE COURT: Is your mind clear?

MR. BAKER: Yes.

THE COURT: You speak and understand the English language?

MR. BAKER: Yes.

THE COURT: Okay. Do you have -- you've gone over this with your lawyer so far?

MR. BAKER: Yes.

THE COURT: Okay. I'm going to hand this back to you and have you sign this, that you acknowledge that we went over this in open court and you know what you're doing. Okay?

The "Waiver of Jury Trial" form signed by Baker provides as follows:[4]

1. I waive my right to a jury trial in the following charge(s): [Abuse of Family or Household Member]

PLEASE PLACE YOUR INITIALS IN THE SPACES PROVIDED IF YOU UNDERSTAND AND AGREE WITH THE FOLLOWING STATEMENTS.

2. ___ I understand that I have the constitutional right to a jury trial. Furthermore, I unde[rstand] that a jury trial is a trial in the Circuit Court before a judge and a jury and that I can partic[ipate in] the process of selecting a jury of twelve (12) citizens from the Third Circuit. This jury w[ould hear] the evidence in my case and then decide if I am guilty or not guilty. Finally I understand [in] order for me to be convicted by a jury, their vote must be unanimous.

_____

[4] The first page of the Waiver of Jury Trial form in the record is truncated on the right side, such that certain words or portions of words at the right edge of Paragraphs 2 and 3 are missing and cannot be seen. The portions of Paragraphs 2 and 3 that cannot be seen on the Waiver of Jury Trial form in the record are set forth in brackets in the quoted material. The words and portions of words included in the brackets are taken from the recitation of the Waiver of Jury Trial form set forth in Baker's opening brief.

3. ___ I know that if I give up my right to a jury trial, the trial will be held in this Court be[fore a] judge who alone would decide if I am guilty or not guilty. I request that my case be tried [before a] judge.

. . . .

4b. ___ I am satisfied with my attorney, and am entering this waiver with his her advice.

5. ___ I know that the punishment cannot be increased merely because I want a jury trial.

6. ___ I am entering this waiver of my own free will after careful consideration. No promises or threats have been made to me to induce me to waive my right to a jury trial.

Baker's initials appear in the spaces next to Paragraphs 2, 3, 4b, and 5, but do not appear in the space next to Paragraph 6. Baker's signature appears on the form after Paragraph 6. The form contains a "CERTIFICATE OF COUNSEL" which states:

As counsel for defendant and as an officer of the Court, I certify that I have read and explained fully the foregoing, that I believe that the defendant understands the document in its entirety, that the statements contained therein are in conformity with my understanding of the defendant's position, that I believe that the defendant's waiver is made voluntarily and with intelligent understanding of the nature of the charge and possible consequences, and that the defendant signed the form in my presence.

(Emphasis added.) The signature of Baker's counsel appears after the Certificate of Counsel. Baker's signature appears a second time on the form after an acknowledgment that "Judge A. Wilson questioned me personally in open court to make sure that I knew what I was doing and understood this form before I signed it." (Parentheses omitted.)

Baker argues that his jury trial waiver was invalid because his initials do not appear in the space next to Paragraph 6 on the form. We disagree.

The Waiver of Jury Trial form advised Baker of his right to a jury trial and the consequences of his waiver. Baker's counsel certified that counsel had fully explained the contents of the form to Baker and that counsel believed Baker's waiver was voluntary and intelligent. Baker stated to the Family

8

Court that he did not have any questions about the waiver form, that his mind was clear, that he understood the English language, and that he had gone over the form with his lawyer.  There is nothing in the record to suggest that Baker was pressured or coerced into waiving his right to a jury trial, which is the focus of Paragraph 6 of the form.  Moreover, Baker does not identify what aspect of his right to a jury trial or his jury trial waiver he failed to understand or explain why his waiver was involuntary.  Under these circumstances, we conclude that Baker's failure to initial Paragraph 6, which appears to simply have been an oversight, did not render his jury trial waiver invalid.  See Friedman, 93 Hawai'i at 70, 996 P.2d at 275 (concluding that the defendant's "mere assertion that he did not possess a 'complete understanding of his jury trial right,' by itself, does not establish that his jury waiver was not voluntary and knowing").

II.

Although Baker did not specifically argue a "choice of evils" justification defense at trial, he argues on appeal that the Family Court erred in finding him guilty because there was insufficient evidence to negate such a defense.  We disagree and conclude that there was sufficient evidence to negate a "choice of evils" justification defense.

We review the sufficiency of the evidence in the light most favorable to the prosecution.  State v. Tamura, 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981).  The prosecution disproves a justification defense when the trier of fact believes the prosecution's case and disbelieves the defense.  See State v. Pavao, 81 Hawai'i 142, 146, 913 P.2d 553, 557 (App. 1996).

The "choice of evils" justification defense is set forth in HRS § 703-302 (1993), and provides in relevant part:[5]

_____

[5]  HRS § 703-302 more fully provides:

§703-302 Choice of evils. (1) Conduct which the actor believes to be necessary to avoid an imminent harm or evil to the

(continued...)

> [c]onduct which the actor believes to be necessary to avoid
> an imminent harm or evil to the actor or to another is
> justifiable provided that . . . [t]he harm or evil sought to
> be avoided by such conduct is greater than that sought to be
> prevented by the law defining the offense charged[.]

(Formatting altered.) Baker contends his conduct was justified under HRS § 703-302 because he reasonably believed that his actions were necessary to prevent the CW from causing imminent harm to herself or others by driving while intoxicated. However, when viewed in the light most favorable to the prosecution, there was substantial evidence to negate a "choice of evils" defense.

For the "choice of evils" defense to apply, Baker must have believed his conduct was necessary to avoid a greater imminent harm. In other words, Baker's actual motive for his altercation with the CW must have been to prevent the CW from causing greater imminent harm to herself or others by driving while intoxicated. The State presented evidence that Baker's true motive for physically abusing the CW was not to prevent her from driving while intoxicated, but because he was angry or upset with her.[6]

---

[5](...continued)
actor or to another is justifiable provided that:

    (a)    The harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and

    (b)    Neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

    (c)    A legislative purpose to exclude the justification claimed does not otherwise plainly appear.

    (2)    When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for the actor's conduct, the justification afforded by this section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.

    . . . .

[6] Officer Cabatu testified that Baker stated that he had been involved in an argument with the CW earlier that evening, and Chad testified that he saw Baker arguing with the CW at the CW's car.

In addition, Officer Cabatu testified that after the CW's friend yelled for help, Baker looked up towards the police and then quickly left the scene. The evidence also shows that as he walked away, Baker asked Chad, whose car was in the same parking lot as the CW's car, to pick Baker up at a different location. This evidence contradicts Baker's claim that he acted to prevent the CW from driving while intoxicated out of a concern for her welfare and the welfare of others. Instead, it reflects Baker's consciousness of guilt. As the Family Court observed, if Baker's true motive was to stop the CW from driving while intoxicated, Baker would have welcomed the presence of the police and would have wanted to attract their attention so that they could assist him in stopping the CW from driving.[1] We conclude that there was sufficient evidence to negate a "choice of evils" defense.

### III.

Baker argues that the Family Court violated his rights to a fair trial, due process, and to present a defense by relying on a written police report of Baker's interview statement, which had not been admitted at trial, to find Baker guilty. He further

---

[1] The following took place during Baker's sentencing allocution:

[BAKER]: Oh, yeah, we had an argument. That's when she left. But our plan was to catch a taxi to our -- we had a room.

THE COURT: So why did you tell [Chad] to meet you at Huggo's.

[BAKER]: Cause I didn't want to be on the top part because she was in the middle of the road screaming. So I just didn't want to be -- you know, it's kind of shame -- kind of embarrassing she was screaming like really loud for no reason.

THE COURT: Uh-huh. Wouldn't that be something that you would want because you want the police to come and stop your girlfriend from driving?

[BAKER]: Uh, no.

THE COURT: Cause it would attract attention and you could tell people I'm trying to stop this woman from driving.

[BAKER]: Yeah, but I mean I didn't --

THE COURT: -- maybe because you were intoxicated as well.

contends that the Family Court violated his right to due process in relying on the same written report of Baker's statement, which Baker claims he had no opportunity to review, controvert, or supplement, in sentencing Baker.

Baker's contention that the Family Court improperly relied upon the police report of Baker's interview statement is based on comments made by the Family Court during its sentencing of Baker. As explained below, the Family Court's comments cited by Baker are not sufficient to demonstrate that the Family Court improperly relied upon the written report of Baker's interview statement in finding Baker guilty or that the Family Court violated Baker's due process rights at sentencing. We therefore decline to overturn Baker's conviction and sentence. Our decision, however, is without prejudice to Baker raising his claims, based on a more fully developed record, in a petition pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 40 (2006).

A.

After the parties completed their closing arguments, the Family Court found that the State had proven beyond a reasonable doubt that Baker had committed the offense of abuse of a family or household member. The Family Court explained that in reaching this finding, it was relying on Officer Cabatu's testimony and the Domestic Violence Statement Form signed by the CW. Without recessing the proceedings, the Family Court then invited comments on sentencing.

During the parties' sentencing arguments, Baker's counsel asserted that Baker's attempt to take the keys away from the CW so she could not drive home and the lack of any significant injuries to the CW were mitigating factors that the Family Court should consider in imposing sentence. The Family Court then gave Baker the opportunity to speak and the following colloquy ensued:

> THE COURT: Okay, Mr. Baker, do you wish to make any further statement?

12

[BAKER]: Uh, yes, as far as the -- me trying to leave the scene, I just left because she was screaming and I just didn't want to be around it so I told my friend to pick me up down below. I wasn't running. And like when the cops found me, I was just sitting down at Ocean's. Not like I was gonna dig -- dig out.

THE COURT: Hmm-hmm.

[BAKER]: So I mean I could easily have ran and got away, but I just feel like I didn't do anything. I figure I'll take the keys from her. The cops come and ask me for the keys, I'll just give it to them and let them deal with her. That was my plan to take the keys from her and since she was drunk. And when the cops come for the keys, I'll just give them the keys and let them decide if she can drive or not. But it got a little -- I didn't expect them to wrestle me for it. And once she bit my arm, I just -- I was over it. I just let go. I had to close the door and that was when Tara jumped out of the car started screaming and I was like -- I just left. I didn't want to be around it.

THE COURT: <u>I didn't see anything in your statement to the police about these other factors</u>.

[BAKER]: What other factors?

THE COURT: <u>At least when Officer Cabatu testified, I didn't hear -- and maybe I missed it -- I didn't hear your report that she bit you</u>.

[BAKER]: I know. He didn't even take pictures of it. When we were at the station was when I told him. I asked him if he was gonna take a picture.

THE COURT: <u>I did see in his report that you said to him that she was upset because another woman talked to you at the bar. That's what you reported to him</u>.

[BAKER]: Oh, yeah, we had an argument. That's when she left. But our plan was to catch a taxi to our - we had a room.

(Emphases added).[8]

B.

Baker contends that the Family Court's comments during the above colloquy establishes that it improperly considered the police report of his interview statement in finding him guilty. We note that while Officer Cabatu testified about the contents of Baker's interview statement, the written police report of Baker's

_____

[8] After further discussion between the Family Court and Baker about Baker's reason for leaving the scene, the Family Court stated: "Yeah. Okay. So I will find you guilty and place you on probation for a period of two years." The Family Court then proceeded to detail the conditions of Baker's probation.

statement was not introduced in evidence. Therefore, it would have been improper for the Family Court to consider the written report of Baker's statement, which was not part of the trial evidence, in finding Baker guilty.

However, we conclude that the record does not establish that the Family Court considered the written report of Baker's interview statement in finding him guilty. Prior to the above colloquy cited by Baker, the Family Court had already found beyond a reasonable doubt that Baker had committed the charged offense. In explaining its decision, the Family Court specifically stated it was relying upon Officer Cabatu's testimony and the CW's Domestic Violence Statement Form, which had been admitted in evidence. The Family Court did not mention the written report of Baker's interview statement to the police in explaining its finding that Baker had committed the charged offense.[9]

"In a bench trial, we presume that the judge was not influenced by incompetent evidence." State v. Lioen, 106 Hawai'i 123, 133, 102 P.3d 367, 377 (App. 2004); see State v. Antone, 62 Haw. 346, 353, 615 P.2d 101, 107 (1980); Harris v. Rivera, 454 U.S. 339, 346 (1981) (per curiam). In addition, "[t]rial judges are presumed to know the law and to apply it in making their decisions." Walton v. Arizona, 497 U.S. 639, 653 (1990), overruled on other grounds by Ring v. Arizona, 536 U.S. 584 (2002); see Au-Hoy v. Au-Hoy, 60 Haw. 354, 358, 590 P.2d 80, 83 (1979); State v. Pascua, No. 30074, 2010 WL 3705993, at *3 (Hawai'i App. Sept. 23, 2010) (SDO). We conclude that the comments of the Family Court cited by Baker are insufficient to overcome the presumption that the Family Court properly applied the law and was not influenced by incompetent evidence.

---

[9] Although the Family Court did state it was finding Baker guilty after the colloquy cited by Baker, the record shows that the colloquy was part of Baker's allocution during the sentencing phase of the proceedings, after the Family Court had already adjudicated his guilt.

C.

Baker contends that the Family Court violated his due process rights by considering the written police report of his interview statement in sentencing him because he did not have the opportunity to examine, controvert, or supplement the report. We conclude that the existing record is not sufficient to support Baker's claim of a due process violation or demonstrate that the Family Court erred.

At the outset, we note that although ambiguous, the record suggests that Baker did have the opportunity to examine the written report of his statement to the police before sentencing. In pretrial discovery, Baker requested a copy of all written or recorded statements and the substance of all oral statements made by "the Respondent" within the State's possession or control. The record does not contain a subsequent motion to compel discovery by Baker regarding this request. During the direct examination of Officer Cabatu, Baker's counsel requested that he be allowed to voir dire the officer regarding the voluntariness of Baker's statement, without indicating that he did not have the statement. Moreover, the prosecutor used Officer Cabatu's written report of Baker's interview statement to refresh the officer's recollection as to the contents of Baker's statement. The record reveals that at that time, the prosecutor showed the written report of Baker's statement to defense counsel ("[Prosecutor]: I'm showing one page from the officer's report to defense counsel at this time.").

We also note that the written report of Baker's interview statement is not part of the record, and we therefore are unable to compare the Family Court's comments against the written report. Indeed, the State argues on appeal that the Family Court's comments cited by Baker do not demonstrate that the Family Court had seen the report of Baker's interview statement. Instead, the State asserts in its brief that:

> The Judge's statements at sentencing about what he saw or heard in Officer Cabatu's report, is likely a result of

15

hearing Officer Cabatu testify about the facts and about what he had in his report, taking notes about the testimony in June and referring to those notes about Officer Cabatu's report of events after the trial concluded in August.

When the Family Court made its comments at sentencing, Baker did not object on the ground that he had not been given the opportunity to review, controvert, or supplement the written report of his interview statement. Baker also did not seek a continuance to give him more time to respond to the Family Court's comments. The absence of the written report from the record also means that we cannot compare Officer Cabatu's testimony regarding Baker's statement with the contents of the written report. Under these circumstances and based on the existing record, we cannot say that the Family Court violated Baker's due process rights in sentencing him. See State v. Hoang 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000) ("Where the record is insufficient to show that the alleged error occurred, the presumption that the arraignment was valid as required by law must prevail.") (citing State v. Apao, 59 Haw. 625, 638, 586 P.2d 250, 259 (1978)).[10]/

D.

Although we conclude that Baker failed to establish that the Family Court erred, we acknowledge that the record is not entirely clear regarding whether, and the extent to which, (1) the Family Court and Baker had access to the written report of Baker's interview statement and (2) the Family Court

_____

[10]/ Baker claims that the Family Court could not consider Baker's police report because, as a general rule, a police report is irrelevant and unreliable. We reject this claim. A sentencing court is entitled to consider a broad range of information from a variety of sources in determining a defendant's sentence. State v. Alexander, 62 Haw. 112, 118, 612 P.2d 110, 114 (1980) ("In evaluating the defendant's character and scope of criminality and in predicting his [or her] future conduct, the sentencing court . . . 'may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he [or she] may consider, or the source from which it may come.'" (quoting United States v. Grayson, 438 U.S. 41, 50 (1978))). A police report is at minimum relevant to "[t]he nature and circumstances of the offense and the history and characteristics of the defendant[,]" which a sentencing court must consider under HRS § 706-606 (1993) in determining the sentence to impose. Moreover, we note that police reports are routinely included in presentence reports and relied upon by courts in imposing sentence.

considered the report in finding Baker guilty and in imposing sentence. Our decision in this case is therefore without prejudice to Baker raising his claims, based on a more fully developed record, in an HRPP Rule 40 petition.

CONCLUSION

For the foregoing reasons, we affirm the Judgment of the Family Court.

DATED: Honolulu, Hawai'i, May 31, 2013.

On the briefs:

Audrey E. Stanley
Deputy Public Defender
for Defendant-Appellant

Linda L. Walton
Deputy Prosecuting Attorney
County of Hawai'i
for Plaintiff-Appellee

Chief Judge

Associate Judge

Associate Judge

17